Case No. 22-2670 from Nebraska, United States v. Sergio Jimenez Thank you, Your Honor. May it please the Court, Opposing Counsel, and members of the defense, Mr. Sergio Jimenez, a 20-year-old Hispanic male who was charged in this case with possession with intent to deliver methamphetamine. In this particular case, I am asking this Court to issue a ruling explaining just how limiting U.S. v. Moreno is. I feel that Defense Counsel, the government, and law enforcement were put on notice by the Eighth Circuit Court of Appeals in its ruling of U.S. v. Moreno that that was a limited application of an ability to stop, detain, and frisk, and do a probable cause warrantless search of an individual at a bus stop. The facts of Moreno can be easily differentiated from the facts of my case. As outlined in my brief, in Moreno, this woman was traveling, and when she was and speaking with law enforcement, they asked for a ticket. It stated that it was going from Denver to Chicago. The destination tag on the luggage said Denver, and it was not checked in where she originated out of Las Vegas. This alerted officers with a bogus phone number. The bag had to be checked at each stop. There was no personal tag. The officers were concerned that the bulge that they saw on Ms. Moreno could have been a book, gun, or a bomb. It's clear under Terry v. Ohio that if they're at risk or they think that law enforcement is in danger due to a bomb, that they can do a protective pat-down or they can remove that item to figure out what it is. The Moreno Court made an interesting comment, and it said in its ruling, it was curious about how touching a bomb was going to be a good idea by law enforcement. And I want to circle that back to Mr. Jimenez's case when we go here. This case is unique in my opinion because Mr. Jimenez had three encounters with law enforcement. Most of the time in my career, and when I look at appellate arguments, there's only one encounter. Sometimes you'll see a second encounter if maybe it was a traffic stop, and so you would stop a vehicle, you would go back, run those plates, driver's license, go back to the car, and I would say that would be a second encounter, and that's, we're going to have you come back to the car. We're going to pat you down, make sure you don't have weapons, and we're going to put you in our vehicle for more questioning or those types of things. This is the only case with all due respect to this court that I could find where there had been three police encounters. And so in the three police encounters that Mr. Jimenez has with him, he explains what is going on in the first two. It is curious to me that the law enforcement officer that knows he's going to be doing surveillance of this Denver to Omaha bus stop didn't charge his camera the night before. I think it's sloppy. And so we have to rely on what his memory tells us about what happened. During the first encounter, he sees my client looking for something in a bag. He goes over, he flashes a flashlight in it, and doesn't see a whole lot of clothing. But he doesn't ask my client, do you have any other bags on that bus? Do you have any bags underneath the carrier of that bus? And this is a unique part of traveling on a bus. And I've done it. When you travel on a Greyhound, there's a compartment underneath. And when you watch Exhibit 1, you're going to see hundreds of bags underneath that compartment. They also had testimony, and that's why I left my belongings on the bus. Nobody asks if you left belongings on the bus. So when the law enforcement officer relies on, well, he didn't seem to have a whole lot of clothing, and that piques my interest, and he had some weird stuff in there, but who am I to say what he travels with? I think we have to look at the totality of the circumstances here that we never know what else is on that bus. Cancel, can I ask you a question? So on Moreno, I wanted to be able to finish your thought, but most of what you're arguing gets at reasonable suspicion. And I do think there's some distinguishing characteristics, and we have to decide if they're significant enough to go differently than Moreno. But on the issue of reaching under the blanket and the scope of the search itself, I wonder if that is controlled by Moreno. Because I don't see much of a difference between what happened in Moreno as to the scope of the search, even though there might be a difference on reasonable suspicion. I differentiate, and what I look at is in Moreno, they did look, they reached underneath the blanket. I understand that. In my particular case, when I watched the video again, and this was after the ruling came out, what I see is that there is a grabbing, and there's a touch, and it's happening. So there's the tendency under Eustachio, which is touching is that illegal detention. And in that particular case, that was at the Omaha airport. And this woman, what they did is she didn't pull the clothes close enough to their body. They saw a line of a bulge, and they reached and touched the bulge. And there's no duty under any precedence that we have a duty to manipulate our clothing, to lift anything up. And that's where I think it's more controlling, is when you look at the video, and the officer touches, and then they subsequently remove this blanket for him, that's what I think the illegal activity was. Is that constitutionally significant? And the reason why I ask that is you started by saying, I don't know why you're touching the bomb. Is that a good idea? But the fact of getting it out in the open and holding on to him or whatever, that makes it a safer encounter for the police. So I'm just trying to figure out, under a reasonability analysis, whether what you're saying is constitutionally significant. And I understand your point, Your Honor. I think it is constitutionally significant, because at the point that they start touching and removing, they didn't see any bulge. They didn't know what was underneath. When we look at these other cases, they had seen a bulge. The only reason in Jimenez that there's any talk of a bulge is because they touched him. And so I don't think they got to that point, at that point in Jimenez, because they weren't under any suspicion of, we saw something and it looked like it was a bomb. And so that's why I think it's differentiated under those facts of those cases. Counsel, is there any distinction between a blanket and clothing? I mean, some of these cases involve clothing. Moreno, in this case, involved blankets. Just a general question, do you see any difference between those two? In other words, there might be more protection for clothing that's worn directly over the body than a blanket that's worn on top of clothing. I think a blanket needs to be treated as clothing when it's worn. And the reason why is there's different clothing that wears differently. I wear a lot of scarves. Some of them are very large. So a scarf is like a blanket. It is worn. Some people like to wear, I've seen women wear the types of coats where it has a little buckle up here that kind of looks like a coat. It's more of a formal wear. Kind of looks like a blanket. Much like the way that Mr. Jimenez was wearing this blanket at this particular time. I think anything that is worn upon the body, whether it's a blanket, it's a scarf, is treated as an article of clothing. I don't think there should be a differentiation between this person had on a suit jacket or this person had a blanket because it's being worn on top of him. This is, babies wear blankets. We use blankets to swaddle young children for warmth. These types of things. So I was trying to make the point respectfully in my brief that anything that is worn upon the body is to be construed as an article of clothing. With the case of Aquino, I think this case is illustrative as well. I call it the pant case was, this case turns not on Aquino's last act before being handcuffed, but rather on Lutter's first act after placing Aquino in handcuffs. And it's directly on the video. And again, it's only the third encounter that's on that video and what we see is my client with his hands on his cell phone. His hands are out. They're out in the open. Some of the other cases that we review, it will show that we don't know where the hands are at or they're reaching underneath their pants or something like that. But in this particular case, a very, very important factor that I think weighs in favor of Mr. Jimenez is his hands are always out in the open and you see him with his hands on his cell phone at the point that they say, you're detained. We got enough. We're taking you in. He reaches down to grab a bag that has already been searched by law enforcement. That law enforcement officer has already communicated with Officer Bonnie that this person has no bombs, has no contraband, there's nothing in that bag. They already know that the book bag that he's wearing has nothing in it. So when he has a cell phone in his hand and he reaches down for a bag that law enforcement already knows has nothing in it, I don't think at that point they can say, officer safety, and then do the touching and take off this blanket that they already know and continue that search from there. And so I think that's a key point. Counsel, okay, this was on September the 14th. This interaction took place in September, correct? Yes. Okay. Just factually, I need for you to help me on two or three things. One is, you mentioned it earlier about how baggage is transported on a bus. Did the appellant have a bag or more than one bag in the cargo compartment of the bus? That is not part of the record before the court. That was, I asked law enforcement if they had asked him, I believe that's part of the record, and they said they were not aware. They just didn't know? Is that what you're... They did not ask the question. They didn't do any further investigation. Okay, so we don't know. It's not in the record. It's not in the record. And then, okay, this is September. In your honor, I misspoke. It was September 24th, 2020. September 24th. It's in Omaha. Yes. Anything in the record about what the weather was like that day? There's nothing in the record. What I tried to do in my brief is point to certain points of the third video and put time stamps on because that is part of the record for this court. And what I looked at is specifically what other individuals were wearing on that day. On the video at the 10-second mark, there's an individual wearing a hoodie and a vest over it. There was another individual at the 15-second mark who was wearing a black parka. There was an individual at the 20-second mark who was wearing a winter stocking cap. At the 29-second mark, there was an individual that was wearing a car park jacket. So I went back and I tried to get precise seconds for this court to look at when we can start looking at what the other individuals on the bus were dressed like in September on that day. Okay. And then finally, what do you think about this source state aspect of these cases that the person originates from a source state? I think it's insulting to the source states. I think when you're saying that people that originate from California are drug dealers, I think that's exactly what you're saying. You're saying they're from Oregon or you're saying they're from Colorado. And I think we're insulting those individuals. I individually travel to California quite often. I am now on notice that I am considered I'm traveling from a source state. So I feel that I am at risk and the Fourth Amendment may not protect me from being searched because I am coming from California. So are you aware of any case authority out there that addresses this kind of point that you're making? I think Magistrate Nelson addressed that to say, just gave it the littlest weight possible to say we're not going to look at just because they're coming from a state. There are hundreds of thousands of people that are originating from that state coming here and traveling. And I think that's how courts are dealing with that issue is realizing the totality of the situation of how many flights, how many buses. This bus itself coming from Denver to Colorado, in the record, they know when it comes. And the officer testified as part of the transcript of it arrives right early in the morning at 6 o'clock in the morning or so. And this is its schedule. So they go there for precisely looking for this bus. So when you see the volumes of packages, I think everybody then would be considered as a potential person to be searched if we're going to give credibility to the fact that they're coming from Colorado. Well, let me ask you this with Judge Shepard's permission because I want to, this is so strange because the Moreno case involved the exact same bus station and it involves similar clothing. And was there any evidence at trial that, not so much about the source state, but I mean the coincidence here, that the bus station tends to be a place where a lot of drug activity and drug dealers go such that no matter where you're from, this bus station is a haven of drug activity? Because I just wonder because the facts of these two cases are so similar. May I answer this? Yes. Thank you. There was none. At the motion to suppress hearing, my client entered a conditional plea so we don't have any of those other statements about what happened at trial. But at the motion to suppress, he said that they investigate this bus station. I believe what his testimony is, if I remember correctly, was they surveilled this bus station because bus stations tend not to have a whole lot of security and so that's why they go there is they're looking for drug trafficking. They're looking for, I don't know if he said, I think it was pretty much drug trafficking. I don't think he said weapons. With all due respect to the court, I would have to go back and look at the record. But there was no evidence at the motion to suppress that they have received multiple phone calls. They have complaints of drug deals taking place. There's none of that in the record. It's just they go there, there's certain men that show up and they go in the morning for specifically this Denver to Omaha, I'm sorry, not flight, that's me that takes flights, bus stop. Alright, thank you counsel. May it please the court, opposing counsel, my name is Joe Meyer, I'm a special assistant United States attorney here in the District of Nebraska. I represent the appellee, the United States, which asks that this court affirm the district court in this matter. I'll start with your Honor's question. First, the question of whether the blanket in this case can be served with clothing. I don't think it can, both on the law and on the facts of this case. Moreno, in the Moreno case that we've talked, that's been quite, discussed quite a bit here this morning, the 8th Circuit held that the officer in that case who reached underneath the blanket did not reach underneath Ms. Moreno's clothing. So that's almost an implicit finding that the blanket in that case was not clothing and I think would ask this panel to uphold that ruling. Now if I remember Moreno, the officer saw a bulge before reaching under the blanket, is that correct? Correct, Ms. Moreno opened her blanket, she did it kind of in an awkward or suspicious manner, but she did, she opened it at the request of the officer. And in this case, I think it was either contemporaneous or after the blanket was removed, is that correct? Yes, by my calculation, about 5 seconds, the blanket was not completely removed, Officer Jaworski was the primary investigator who took the blanket off, and then at that time Officer Bonney was looking at Mr. Jimenez's midsection, saw the bulge and did the panel first. The record establishes that he saw it before he touched it. And then on the facts of this case, it's in the record, not on video unfortunately, but it's in the record how Mr. Jimenez wore this particular blanket. He wore this blanket outside the backpack, so it was clothing, a sweatshirt, a jacket, what have you, on his upper body, a backpack worn upon his back, and the blanket over the backpack. So factually, for this court to hold that the blanket was clothing, it would have to hold that the backpack was clothing. And that's a nonsensical conclusion, I believe. Also, in looking at the video, this is a fairly large blanket, it's shoulder to toe on Mr. Jimenez. So here, I do have a question about this. Is the idea from the government standpoint that this person with a blanket, having exited a bus, coming across country, and he's got a blanket draped over him, that that was, what, suspicious? The fact that he had a blanket was suspicious given the dress of the other passengers and the time of year, yes. Well, counsel has just described several other passengers that are visible in the video that are wearing a stocking cap, hoodie, parka, jackets. And I have no reason to question counsel on that, and I believe that's in the record and on the video. The most suspicious thing with regards to the blanket is Mr. Jimenez's action when he takes off his backpack. When he takes off his backpack to allow for the consensual service of the backpack, he intentionally leaves on the blanket. And the testimony from Officer Bonney is that he shimmied out of the, he shimmied in a way that the blanket Okay, and I can see that, but it gets back to my point. So, I just want to be clear, what's the government's position on this particular part of the factual scenario, which is the passenger with the blanket draped over him who's just gotten off of a bus coming from cross country. Is that something the government would assert is one of the factual factors that gives rise to reasonable suspicion? Yes, I think in my brief I give a total of seven factors. I give five that support the reasonable suspicion of criminal activity for the terrorist. Okay, so this gets back to my question, which I don't think you really answered. Why is it suspicious? Why is it in any way suspicious? Because of late September, Officer Bonney himself was wearing a short-sleeved t-shirt and no other passengers had blankets, were wearing blankets. Also, the manner in which he was wearing it outside the backpack. Well, he couldn't wear it inside the backpack, could he? Probably not. And it's suspicious as to what the suspicion of criminal activity or the suspicion of weapons, possession of weapons? I think both. I guess if I can, I'll just lead to the factors that I identified in my brief. The five that go to reasonable suspicion of criminal activity identify the inconsistent story about his travel itinerary, who bought his ticket. But that's not necessarily inconsistent. Didn't the magistrate suggest that it's not necessarily inconsistent? That's possible. I would defer to the magistrate. And again, the reasonable suspicion standard is low, but I think the magistrate judge said that's not necessarily suspicious. It could be, but again, it's one of five factors, one of multiple factors, and it's a totality of the circumstances of the analysis. The most important question on the facts is, and how this case has been developed, do you agree that there's nothing in the record about whether or not the appellant had a bag or more than one bag in the cargo compartment of the bus? I do agree. And so that raises the question, why? Why is that not developed in the record? Because, and I ask that because that's one of the things that is asserted here. He had minimal clothing, but he was on a trip of several days, but he had minimal clothing and had the backpack. But as I think counsel has noted, luggage is carried in the cargo compartment of the bus. Wouldn't that be something that would be significant from a law enforcement standpoint to know whether the man had a bag or more than one bag on the bus? I don't have a great answer for you, Your Honor. I apologize. The record develops that he did have two bags. He had the backpack and the duffel bag. He took the duffel bag off the bus and he was looking inside of his duffel bag. I don't, maybe potentially why it wasn't developed is we're talking about reasonable suspicion to detain Mr. Jimenez and then ultimately reasonable suspicion to carry for him. The seizure of the bus was on the bus. Any potential weapons or bombs on the bus I don't think is an issue here at work. It's a particularized focus upon the officer's interaction with Mr. Jimenez, not the bus in general, other passengers, other packages. I just don't think it's all that relevant. Counsel, you were going to go through some of the factors that go into reasonable suspicion. What are the, I think you said, two that go to the weapons issue? The two would be the noticing of the bulge, which I think the record establishes happens after the removal of the blanket, and then the lack of security at the bus station, which was also a factor in Moreno. I guess the lack of security at the bus station could also lead to reasonable suspicion that he was armed before the blanket was removed because officers, the testimony is they go to this bus station on their daily assignment. They know what they're familiar with. So I guess help me draw the connection between the fact that there's not private security at the bus station and the fact that this particular individual might be armed. Well, that would go to the fact that maybe potentially anyone could be armed at the bus. Isn't that the problem? It's supposed to be individualized. So how can it be individual suspicion? I don't mean to steal thunder here, but how can it be individualized suspicion when it would apply to literally everybody in the bus station? If that's a problem with that factor, then I would just want to reiterate to the court the government thinks the biggest factor to give reasonable suspicion is Mr. Jimenez's shimmy or keeping the blanket on himself when he removes his backpack. But that goes to criminal conduct, doesn't it, not to the possession of a firearm. So that may get you to detention, but I don't think that necessarily gets you to the pat-down, does it? I think it also can support armed and dangerous because the inference from it, which officers are able to draw, is that he wants to conceal his midsection or he wants to conceal his body. The testimony was that officers frankly didn't know what he was trying to conceal. Even when the bullet was seen, they didn't know what that was. Then after the pat-down, Officer Bonney could tell he, I think he could tell it wasn't a gun or he thought it wasn't a gun, but he thought it was something strapped to him and it could have been, including a bottle. The reason I did the analysis and the brief the way I did is because I think it's clear Officer Bonney doesn't see the bullet until the blanket is removed, partially because an opposing counsel brought up Mr. Jimenez is standing there with his hands exposed, but his arms aren't exposed. So let's assume for a minute that the blanket is the same as clothing. I know you disagree with that. What is the legal basis for removing the blanket and then seeing the bulge? The legal basis, I argue, is that once officers make a terrorist stop, which is based on reasonable suspicion of criminal activity, they're allowed to take efforts reasonable for officer safety and to maintain the status quo. So explain to me how the status quo is maintained in this situation. I mean, the Redmond case is two guys in the car, reports of gunshots, a cop outnumbered early on, clearly illegal conduct occurring. This is a different case, I think. So how are they maintaining the status quo when they're actually changing the situation? Well, the detention does change the situation. Mr. Jimenez, up to that point, had been generally cooperative. But officers don't know his—he's being told he's being detained. He's not only being detained, he's being told he's being detained. Officers don't know his reaction to that. They don't know the reaction of other passengers around the parking lot of the bus terminal, and that's why they are physically touching him, moving him to a back office area of the bus station, and that's why they remove. So is this similar—your friend on the other side suggested the common situation is a traffic stop, where there's an initial encounter, there's additional information developed, there's a second encounter, there's a Terry frisk at that point, and then going back to the car for an interview. Is that an analogy that you would agree with here? I'm not sure I can make that right right now. I think the detention and more so the fact that Mr. Jimenez was told he was being detained, that changes the interaction, could change Mr. Jimenez's actions. So I think it's reasonable for officers to take the actions that they did for officer safety, for officer safety being probably the more prevalent reason, but also just to maintain the status quo. This was a non-violent, relatively cooperative encounter. Officers wanted to keep it that way. That's why they physically touched him, went into the back room, and took off his blanket. On the scope of this search, is there a difference between taking off the blanket, requiring taking off the blanket, and reaching under the blanket in Moreno, in the sense that—I mean, again, leaving aside the reasonable suspicion to do that down at all. I'm just—I ask both the counsel, is there constitutional significance to that? And I'm going to ask you the same question. I don't think there's constitutional significance. I think in Moreno, the frisk and detention are actually simultaneous, where at the same time, the frisk actually was the detention in Moreno. Here, I think it's a matter of a few seconds, but the detention precedes the frisk. Also, I'll point out in Moreno, and it's most apparent from Judge Grass's concurrence, there was some concern from Judge Grass that this wasn't a—he called it not a typical frisk for weapons. Instead, he reached immediately for the book-shaped bulge. And I think when the court looks at Exhibit 1 and looks at the video evidence here, this was a typical pat-down. Officer Bonney takes the back of his hand and grazes it along the front of Mr. Jimenez's waistline. Before or after the blanket's taken off? After the blanket began to take off, before the blanket was completely removed. And you don't—to go ahead and rephrase your question, you don't think there's any constitutional significance to the removal of the blanket versus reaching out of the blanket? No, I don't. I think, like I explained to Your Honor, I think officers were allowed to remove the blanket under the Terry frisk, but Terry stopped. If not, then I would ask for this court to do the reasonable suspicion analysis for whether he was armed. What if it was a coat, a parka? Somebody—it was mentioned that there was somebody with a parka in there. Can they unzip the parka and look underneath? No, I believe that's clothing, and one of the biggest reasons is, like, I'm wearing my jacket here today. You can see my arms. You can see my movement. You can see if I'm reaching for something under the coat. You can see those things. You can see my arms. And in this situation, officers were not able to do that with Mr. Jimenez. I thought his arms were out on the cell phone. His hands were out. I think essentially from his forearm down could be visible, but the other part— But he's not going to—you know, he can't grab a weapon with his elbow. Correct. But in combination with the fact that his midsection is not exposed either, so yes, he— But, of course, you know, if I'm wearing a jacket, most FBI agents, you know, wear a jacket and have a concealed weapon under there. So I just—it's a tough, tough case for me. Yeah. I think the ultimate—Mr. Jimenez is allowing officers to see what Mr. Jimenez wants them to see. That's the purpose of the blanket, to keep some things concealed. See, my time is running out, man. Let me finish my thought. Yes. And a coat, a jacket, some other form of clothing, that's not the case. With my jacket here today, everyone sees what they see. It's not as controlled by me. I determined what was visible when I got dressed this morning. It's not a blanket that I can manipulate and move and move my arms and move—I can put my hands in my pockets. So if he was wearing a trench coat, that would be different? I think any coat or any actual form of clothing would be different, yes. The blanket in this case is not clothing. That's the government's argument. So for all those reasons, Your Honor, the government asks that you affirm the ruling of the district court. Thank you. Does Ms. Solomon have any time on that? No. Well, Ms. Solomon, we questioned you pretty thoroughly and took up some of your time. I'll allow you two minutes to respond. Thank you, Your Honor. Justices, Exhibit 1 is the video on this case. You can see on the video yourselves of how the touching happened and how the blanket was removed. So I disagree with opposing counsel. It's actually on the record of the touching and the removal of this blanket. We don't have a video of how allegedly he shimmies because, again, the officer did not charge his video the day before. And so the argument continually is made, well, we are concerned for officer safety. But the point I want to make on rebuttal is first encounter searches the bags, searches the duffel bag and the book bag, knows there's no weapons in there, knows there's no contraband. I'm sorry, it was during the second encounter. I misspoke. During the first encounter, he finds the flashlight in the duffel bag. He knows when he looks in that duffel bag there's a limited amount of clothing, but he doesn't see any contraband. He doesn't see any firearms. He leaves. This officer leaves him. So at that point during the first encounter, he didn't have any suspicion that my client was doing anything other than traveling on a bus from Denver to Colorado. After the second encounter, he had searched the duffel bag and the book bag. He knows at that point there is no contraband or firearms in those items. He then leaves him again. He wasn't concerned about officer safety or passenger safety when he left him again to go deal with something else at the bus station. In fact, he had to go deal and help officers with something else. So we know these officers are having communication. And he doesn't say, I can't help. I have a situation here. He leaves. And this person is left alone at the bus stop again. And he communicates this information to Officer Bonnie. So all law enforcement during the third encounter are on notice that there is nothing in that backpack and there's nothing in the duffel bag. And they go back to do more questioning of him. His hands are out. They're visible. And I don't think anywhere in our Constitution it says that we have to expose our forearms or anything. His hands are out holding a cell phone, and you'll see that on the video. And for those reasons, looking at the totality of the circumstances, I'm asking that you make the right decision and find that a violation of the Fourth Amendment took place and uphold our Constitution. Thank you very much. Thank you, Counsel. The case has been thoroughly argued this morning, and we appreciate your arguments. The case is submitted. And we'll have a decision as soon as possible. Thank you very much. Thank you. Thank you. Thank you. Thank you.